IN THE SUPERIOR COURT FOR THE STATE OF WASHINGTON
AT KING COUNTY

| | |
|---|---|
| JOHN ALDERSON,<br><br>　　　　Plaintiff,<br>vs.<br><br>DELTA AIR LINES, INC.,<br><br>　　　　Defendant. | CASE NO.:<br><br>**COMPLAINT FOR DAMAGES: WORKPLACE RAPE**<br><br>**JURY DEMAND** |

## I.   PARTIES

1.1   Plaintiff John Alderson is an individual residing in King County, Washington. Alderson is currently employed as a flight attendant at Delta Air Lines, Inc.

1.2   Defendant Delta Air Lines, Inc. ("Delta" or "the Company") is an airline that services customers with domestic and international flights. Delta is a corporation operating and existing under the laws of the Delaware. Delta's corporate headquarters is located in Atlanta, Georgia. Delta is an "employer" subject to Washington state statutes governing employment discrimination including the Washington State Law Against Discrimination, Ch. 49.60 RCW.

## II. JURISDICTION AND VENUE

2.1 Plaintiff is a resident of King County, Washington.

2.2 At all times material to this action, the Defendants conducted business in King County, Washington.

2.3 This action has been filed within the applicable statutory time periods.

2.4 Jurisdiction and venue are proper.

## III. FACTS

3.1 Alderson realleges and incorporates the preceding paragraphs.

3.2 Plaintiff John Alderson's dream job was to serve as a flight attendant. Accordingly, in late 2017, he applied for a flight attendant position with Delta.

3.4 After submitting his application, Delta conducted both telephonic and in-person interviews with Alderson. Delta hired Alderson on February 19, 2018.

3.5 To work as a flight attendant for Delta, an applicant must pass an FBI Background Check, the successful passage of a Company background check, and an 8-week training course held at Delta headquarters in Atlanta, Georgia. If an applicant passes the training program, the applicant then becomes a flight attendant for a six-month probationary period. The probationary period can be extended for any reason. Once the probationary period ends, the flight attendant then becomes a regular full-time "main line" flight attendant for Delta.

HKM EMPLOYMENT ATTORNEYS LLP
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

3.6     Alderson was directed to report to training in Atlanta on March 19, 2018. Alderson stayed at a hotel with a roommate and the training occurred at the Delta Training Center at the Delta corporate headquarters.

3.7     Alderson was in a training class of about twenty-six other trainee flight attendants. He was assigned to class I-2, which started each morning at 8:00 am. The main instructor was Philip Dubey and he engaged in much of the training. That being said, for specific subjects, other Delta instructors would teach particular areas. All training is taught per FAA Requirements. Trainees are not allowed to miss a class session for any reason. If a trainee misses a class, they are removed from the program.

3.8     Christopher S. Halsey was one of the main instructors for Emergency Management Week (EMV Week), and was also one of two instructors for the 3-Point Drill Training.

3.9     As an instructor, Halsey had significant power of all the trainees, including Alderson. This power was amplified when he served as a grader for several of the tests. All the Delta trainees are expected to pass the various tests, and if trainees are unable to pass a particular test, then they are removed from the training program and fired from Delta.

3.10    Halsey had been employed with Delta for roughly thirty years.

3.11    At the start of Emergency Management Week, which Halsey taught, class introductions were made. In his introduction, Alderson said that he grew up on a farm and that he enjoyed marathons.

3.12  Almost immediately, starting on the first day, Halsey took an inappropriate interest in Alderson. During a break on the first day, Halsey asked Alderson about his exercise regime, eating habits, and health. Throughout the week, Halsey continued to ask and inquire about inappropriate subjects relating to Alderson's physical attributes, his diet, and even his sweating habits. Halsey further made inappropriate comments to Alderson regarding his physical appearance and how Halsey was excited that they would be "friends" after the training. Halsey specifically told Alderson that Halsey would "be a good friend to have" after training, and how "so many people never make it through training."

3.13  At the start of training, it was told to students in training that they needed to "show proper respect to all individuals at training," and that they needed to be "friendly and warm" showing the "Delta Values" as part of the "Delta Family." In addition, students were told that they are "constantly watched" by others throughout training.

3.14  The excessive attention given to Alderson by Halsey made Alderson very uncomfortable. He would often try to avoid Halsey at times, but it was often unavoidable, and he was often subject to inappropriate inquiries and comments by Halsey.

3.15  During the mid-term, "doors week," and final exams, trainees are often alone with the instructor for particular aspects of the required training as the trainee has to describe a particular piece of equipment or explain a certain procedure. The instructor then has significant discretion whether to "pass" or "fail" the trainee. If the trainee is unable to pass the exam, then the trainee is released from the program and fired from Delta.

HKM EMPLOYMENT ATTORNEYS LLP
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

3.16   In one of Alderson's first exams, Halsey was the grader, and Alderson met with Halsey in a room. Alderson was required to describe a particular piece of equipment involved in emergency safety. Throughout the test, Halsey told Alderson that he was "failing" and that he "nearly failed." Then, after the test, Halsey said to Alderson that they should be friends, that Alderson "failed," but that Halsey felt Alderson "deserved to pass."

3.17   For the next several days, Halsey continued to emphasize that Alderson owed his position at Delta to Halsey, and that Halsey could have failed him. For emphasis, Halsey said that he had failed Alderson's roommate and that his roommate was now gone from the program. Halsey indicated that Alderson's roommate apparently "did not want it enough."

3.18   The power that Halsey had over Alderson became a constant theme for the remaining conversations between them. Halsey continued to remind Alderson how many trainees do not pass and become flight attendants. Halsey frequently mentioned how Alderson's roommate did not pass, and how this could also happen to Alderson. Halsey also said that he would be "bidding for I-2" so he could conduct the finals for Alderson's class and specifically for Alderson. Halsey told Alderson he needed to be careful because "things happen." Halsey then went on to state how "he can help [Alderson] out," and that "he passed [Alderson] through the EMV Week even though [Alderson] should have failed."

3.19   At one point, Halsey told Alderson that he "should be concerned about not passing" and, in the same conversation, mentioned how Alderson would be a great "test subject" and "specimen" for his "project" that Halsey was working on. Halsey then asked

COMPLAINT FOR DAMAGES - 5

about Alderson's sweating habits, eating habits, weight, and hobbies. Halsey also said that they "should be friends and will be friends after training" and that Halsey told Alderson he "looked much younger" than his actual age.

3.20   Halsey continued to remind Alderson of the power that Halsey had over him. At one point, Alderson allegedly did not wear the correct jacket, but was not written up but was merely told to wear the correct jacket next time. Halsey said that he became aware of the incident and that he "worked it out" for Alderson.

3.21   Halsey continued to imply, in no uncertain words, that he controlled Alderson's career at Delta, and even his employment. Halsey also further made continued comments about Alderson's sweating habits and how Alderson would be a good test subject. At one point, Halsey said that he would call Alderson after training, and that he already had Alderson's phone number. Alderson found this strange because he had never given his number to Halsey and Alderson assumed Halsey received it from the personal information stored about all Delta trainees in Delta's Human Resources Department.

3.22   Halsey had details of Alderson's file, employment history, living situation, and address, and, upon information and belief, Halsey obtained this information through Alderson's personnel file at Delta.

3.23   On the final exam, Halsey was the grader for Alderson on a portion of the final test specific to EMV. Again, this was a situation where Halsey was alone with Alderson, and where Halsey had significant discretion to say whether Alderson passed or

HKM EMPLOYMENT ATTORNEYS LLP
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

failed. If Halsey said Alderson "failed," then Alderson would be terminated from the program and fired from Delta.

3.24 During the exam, Alderson provided answers, but Halsey again said that Alderson had failed, but that Halsey "was going to pass Alderson" anyway. Alderson asked what specific items he failed, but Halsey refused to say.

3.25 During the final exam, Halsey told Alderson that he was a great subject and he "never tells his students that" and Alderson should feel "special" as a result. After the exam, Halsey also stated he was going to be in the lobby of the hotel that evening and would be "waiting for" Alderson "after the exams." Halsey sent Alderson the first of many text messages that afternoon at 5:35 PM on May 9, 2018:

> *"I've been waiting for this day for 8 weeks and I know you should be so proud. I know we will be talking often...You're the only one that has this contact, that should say something.."*

3.26 Through the training program, the Company created a culture of fear, including a fear of reporting harmful activity. For example, in one situation, Alderson told IFS Management the truth about someone else drinking while in the training and being under the influence while on Delta property. Instead of applauding Alderson's efforts to come forward with the truth, the Company lectured and reprimanded him for not disclosing the issues earlier. Based on this, Alderson felt that if he ever reported Halsey to anyone at Delta, the Company would likewise discipline Alderson for not bringing up the situation involving Halsey to Delta sooner.

HKM EMPLOYMENT ATTORNEYS LLP
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

3.27    Halsey continued to send text messages with inappropriate comments regarding Alderson's appearance, among other things, and even requested that Alderson send photos of himself.

3.28    Alderson graduated from the training program on May 11, 2018. When Alderson went to the graduation program on the early morning of May 11, Halsey was waiting for him in the hotel lobby. They talked briefly in the lobby before Alderson left for the graduation. During this conversation, which occurred around 6 am, Halsey said that he could assist Alderson in getting extra assignments at Delta. Halsey also reminded Alderson was still on probation and that he did not pass the final exam. Halsey concluded by noting that Alderson "was lucky" that Halsey "was his instructor." Halsey also said that if Alderson did not write a good evaluation for him, he would definitely know.

3.29    The following day, Halsey sent Alderson the following text message:

> ...I definitely can use you for my physiology project for school as much as you run... I'm going to have withdrawals not seeing you around the training center...

3.30    On June 3, Alderson was on a route that went through Atlanta. Halsey, who had access to Alderson's schedule, knew this and told Alderson that he would meet him at the hotel. Halsey was staying at the same hotel while on Company business. Alderson tried to dissuade him, but there was nothing he could do.

3.31    Halsey was waiting for Alderson at the hotel, and made this known. He texted Alderson several times, stating:

HKM EMPLOYMENT ATTORNEYS LLP
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

*...Did you arrive?...*

*...I know you are tired for sure. It will be so nice to see you...*

*...I woke up especially for you 😊...*

*...Text me when on shuttle...*

*...I know you need to sleep, I will have to leave hotel by 10 to catch flight. But wanted to spend some time with you...*

*...Hopefully sometime we can coordinate our schedules and spend whole day together. I would enjoy that...*

*...Just sipping some Starbucks in lobby wanted to see you in your uniform. 😊...*

*...You didn't know you had a fan club...*

*...Had to go use bathroom too much tea and water be right back...*

3.32   Alderson arrived at the hotel to find Halsey waiting for him. At this point, Alderson simply wanted to go to sleep, as he had been up for a significant amount of time. They talked in the lobby, and then Halsey said that he wanted to give Alderson his schedule so that Alderson could come visit him at a future date. Halsey told Alderson that they needed to go to Halsey's room to get his schedule. During the same conversation, Halsey brought up again doing "testing" on Alderson for his physical fitness. Alderson reluctantly agreed to go to Halsey's room, with the hopes that he could get Halsey's schedule, placate his demand, and then go to sleep.

3.33   Alderson went to Halsey's hotel room. Halsey then provided Alderson a drink that drugged him and made him woozy and confused. Halsey then raped Alderson.

COMPLAINT FOR DAMAGES - 9

HKM EMPLOYMENT ATTORNEYS LLP
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

3.34  Two days later, Alderson reported the rape to Delta Air Lines, and their response was incredibly disturbing. For example, Delta failed to share any information with Alderson as to whether Halsey, the person who raped Alderson, still worked at the company or whether he had even been disciplined. And Delta delayed in getting relevant information to the local detective, which resulted in compromising the criminal investigation into Halsey. Further, Delta would react with tone-deaf comments like, "I hope you're enjoying your new career," after the Company found out that Alderson was raped by another employee. In another example, Delta Corporate Security offered to give Alderson a ride to the police station in Atlanta when Alderson had to do a photo line-up to identify Halsey, they left him there alone by telling him "they had a meeting," failed to pick him up, and told him to take a taxi back to the airport so he could return home.

3.35  On information and belief, Delta knew that Halsey had a reputation for taking an interest in younger men at Delta trainings and taking of advantage of them during the trainings. Indeed, it was an open secret at Delta that Halsey had a thing for students and had a reputation for making inappropriate advances towards students.

3.36  At all relevant times, Halsey was Alderson's supervisor.

## IV.  CAUSES OF ACTION

4.1  Halsey's actions, as a supervisor of Alderson, constitute violations of Washington Laws Against Discrimination, sexual assault, and negligence. Given Halsey's

position of authority as it related to Alderson and his position within the company, Delta Air Lines is liable for the violations stated herein.

## FIRST CAUSE OF ACTION
## WLAD 49.60 (SEXUAL HARASSMENT)

4.2     Alderson realleges and incorporates the preceding paragraphs.

4.3     Delta created a hostile work environment for Alderson while Alderson was employed at Delta.

## SECOND CAUSE OF ACTION
## NEGLIGENT SUPERVISION

4.4     Alderson realleges and incorporates the preceding paragraphs.

4.5     In addition, or in the alternative, Delta was negligent in supervising Halsey, and this negligence proximately caused injuries to Alderson.

## THIRD CAUSE OF ACTION
## NEGLIGENT HIRING

4.6     Alderson realleges and incorporates the preceding paragraphs.

4.7     Delta was negligent in the hiring of Halsey, proximately causing injuries to Alderson.

## FOURTH CAUSE OF ACTION
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

4.8     Alderson realleges and incorporates the preceding paragraphs.

4.9     In addition and/or in the alternative, Delta was negligent towards Alderson. Delta owed Halsey a duty to Alderson that it breached resulting in foreseeable damages to

Alderson. Alderson further suffers from objective symptomatology as a result of Delta's actions.

### FIFTH CAUSE OF ACTION
### NEGLIGENT RETENTION

4.10  Alderson realleges and incorporates the preceding paragraphs.

4.11  Delta had knowledge of Halsey's inappropriate conduct toward others.

4.12  Delta failed to take appropriate action to address the inappropriate conduct by Halsey. As a result of Delta's failure to take this appropriate action, Alderson suffered legally compensable harm including emotional distress damages, and costs of medical treatment necessary to address the psychological damages caused by defendant's conduct.

### SIXTH CAUSE OF ACTION
### NEGLIGENCE

4.13  Alderson realleges and incorporates the preceding paragraphs.

4.14  Delta had a duty to Alderson, breached these duties, proximately causing injuries to Alderson.

### VIII. JURY DEMAND

Plaintiff demands a jury trial.

### IX. PRAYER FOR RELIEF

**WHEREFORE** Plaintiff prays for relief as follows:

A.  Damages for back pay, front pay, lost benefits, and medical expenses in an amount to be proved at trial;

COMPLAINT FOR DAMAGES - 12

HKM EMPLOYMENT ATTORNEYS LLP
600 Stewart Street, Suite 901
Seattle, Washington 98101
(206) 838-2504

B. Damages for loss of enjoyment of life, pain and suffering, mental anguish, emotional distress, and humiliation;

C. Prejudgment interest in an amount to be proved at trial;

D. Compensation for any tax penalty associated with a recovery;

E. Reasonable attorney's fees and costs; and

F. Whatever further and additional relief the court shall deem just and equitable.

Respectfully submitted this 20th day of August 2018.

*s/ Daniel Kalish*
Daniel Kalish, WSBA No. 35815
*s/ Patrick L. McGuigan*
Patrick L. McGuigan, WSBA No. 28897
**HKM EMPLOYMENT ATTORNEYS LLP**
600 Stewart Street, Suite 901
Seattle, WA 98101
Telephone: 206-838-2504
Fax: 206-260-3055
E-mail: dkalish@hkm.com
E-mail: plmcguigan@hkm.com

*Attorneys for Plaintiff Alderson*
